Cecil Murphy, of Gainesville, for defendant in error.

HICKMAN, Commissioner.

In the trial court plaintiffs in error, Georgia Jarrett and others, were awarded judgment for damages against defendant in error, J. W. Ross, in an action which was in form one of slander of title. The Court of Civil Appeals reversed the trial court's judgment and remanded the cause. 146 S.W.2d 219.

When the writ of error was granted it was thought that questions involving the law of slander of title were involved, but upon a more mature consideration of the record it has been determined that no cause of action for damages for slander of title was pleaded. Before trial the plaintiffs abandoned all allegations of their petition, express or implied, that the defendant acted with malice. The effect thereof was to abandon their alleged cause of action for damages for slander of title, for malice is a necessary element of such an action. Humble Oil & Refining Co. v. McLean (Com. App.) 280 S.W. 557; Stovall v. Texas Co., 262 S.W. 152 (error refused); 33 Am.Jur., Libel and Slander, sec. 348.

Plaintiffs seek to uphold the judgment of the trial court upon the doctrine of Humble Oil & Refining Co. v. Kishi, Tex. Com.App., 276 S.W. 190; Id., Tex.Com. App., 291 S.W. 538; Id., Tex.Civ.App., 299 S.W. 687. The petition failed to allege a trespass by defendant and an ouster by him of plaintiffs in denial of their rights. Absent such allegations, the doctrine involved is not applicable. Shell Oil Co. v. Howth, Tex.Sup., 159 S.W.2d 483.

Since the case must be retried, it becomes unnecessary for us to consider any other question discussed by the Court of Civil Appeals.

The judgment of the Court of Civil Appeals reversing and remanding the case is affirmed.

Opinion adopted by the Supreme Court.

**CONSOLIDATED UNDERWRITERS v. RUFF.**

No. 4034.

Court of Civil Appeals of Texas. Beaumont.

July 9, 1942.

Rehearing Denied Sept. 9, 1942.

156 weeks at $10.80 per week, beginning on the 10th day of August, 1941, from which appellant has regularly prosecuted its appeal.

Appellee's employer was engaged in the business of curing and preserving timber, in part, by use of penta-chlorphenol. The timbers were dipped in this preservative. It was appellee's duty to brand the timbers after being dipped, which was done by resting his branding tool on the end of the timber to be branded, and then striking it with a hammer. It was the theory of his petition that striking the timbers with the hammer caused his face to be sprayed with the preservative, which inflicted on him the injuries in issue. The court overruled appellant's motion for an instructed verdict, and all fact issues raised by the pleadings were found in favor of appellee.

■ Appellant makes the point that the court should have sustained its motion for an instructed verdict for the reasons that, on the evidence, appellee had not sustained a compensable injury; he had not sustained any incapacity by being sprayed with the wood preservative; he offered no more than a scintilla of evidence on the issues of liability. These contentions are overruled. Appellee testified as to his employment, the nature of his employment, the use of the wood preservative, his method of branding the timbers, the spraying of his face when he struck the timbers with the hammer, and the injuries suffered by him, all in a manner to support the statement made above.

We quote as follows from appellee's testimony:

"Breathing—well, whenever this would break out on my face the least bit, get out and get a little hot, get heated up in any way at all in the sun, it would swell and my breathing would get bad on me; it chokes my air, otherwise, the stuff would swell when I got hot. * * * The sores and pimples and all, and poison, would break out on my face and my face would swell.

"Q. Are you able to do any type of work now, Jake? A. Not any kind of work.

"Q. Why are you not able to do it? A. Well, I can't stand any heat whatever, and any kind of work I do, in order to call it work of any kind, would heat my body up, and causes my face to get worse so I can't do anything.

C. A. Lord, of Beaumont, for appellant.

O'Fiel & O'Fiel, of Beaumont, for appellee.

WALKER, Chief Justice.

This is a compensation case with appellee, Jake Ruff, the employee, appellant, Consolidated Underwriters, the compensation insurance carrier, and Texas Creosoting Company the employer. On the verdict of the jury, answering special issues, judgment was for appellee against appellant for compensation for total disability for

"Q. I will ask you whether or not the sun would have the same effect upon you? A. The sun does.

"Q. Does that affect your hearing any? A. At times, whenever my face is at its worst, I can't hear anything at all. I have got as much as three weeks at a time I couldn't hear anything.

"Q. I will ask you whether or not that re-occurs at various times? A. Just whenever my face is in its worst, the hearing goes out on me.

"Q. Does it affect your eyes, Jake? A. Well, it affects my breathing and eyes and also my hearing. It has effects all over me whenever my face is festered and in bad order.

"Q. Did you go to work at any other place since you left the employment of Texas Creosoting Company? A. No, sir; I haven't.

"Q. How come you to fill out that blank as you did. A. Well, in filling out that blank I didn't understand the blank; I could not read real well; but I heard I could draw a little time; there wasn't anything done for me while I was going to the Doctor. Then Mr. Brant up there—I notified him I wanted to see him; I was under the Doctor's care."

Dr. Edward C. Ferguson gave the following testimony:

"Q. Dr. Ferguson, from your examination of Jake Ruff, and the number of times he has been to your office for treatment, and from the history he gave you, what have you diagnosed his present affliction to be? A. My diagnosis is that this is an acneform eruption following a chemical burn.

"Q. An acneform eruption following a chemical burn. Now, Doctor, have you made a research or study and endeavored to determine the results of burns by various chemicals? A. Yes.

"Q. And in your study have you acquainted yourself with the reaction of a chemical known as penta-chlorphenol? A. Yes.

"Q. What is the reaction of the tissues of the human skin to a burn by penta-chlorphenol—inflicted by penta-chlorphenol? A. This chemical, after it gets on the skin, produces a condition which is known as photosensitivity. That means that after the sun light shines on this area that has been damaged by this chemical that this eruption is produced, and the entire skin is involved.

"Q. Doctor, I will ask you as to whether or not it is possible to desensitize what is known as a photosensitive skin? A. If thoroughly sensitized they generally remain sensitized. After it is once established, then the rule is to take them away from those chemicals for all times, because they erupt very easily after they have been sensitized.

"Q. I will ask you to explain to the jury the effect of a photosensitive skin and the things that it bring about in the human tissues? A. Photo means light; sensitivity is sensitive to light; in other words, the skin is rendered—that is, it swells up, puffs up, turns red, and in this particular—with this particular chemical, they generally break out with these bumps that look something like acne.

"Q. Doctor, what ordinarily brings about a photosensitive skin? A. Well, these chemicals, some of them; there could be quite a number of conditions that would do that; but this particular chemical is especially prone to bring about that condition.

"Q. Could a man with a photosensitive skin perform manual labor in the sun light? A. Not very well. They generally work at night.

"Q. What effect would it have upon a man with a photosensitive skin to work in a close hot place? A. It would be dilatory to his welfare; the condition might come on him again.

"Q. By dilatory you mean— A. It would make him sick—liable to make him sick.

"Q. Does this chemical, these phenols—do they have any other reaction upon the body? A. They may bring about destruction of the liver.

"Q. Destruction of the liver—what do you mean by that? A. Well, the liver undergoes a fatty degeneration. That is the two outstanding symptoms. As far as the skin poisoning, following the chemical poisoning, you have an acneform rash. After you see it you had better stop then; if you don't, the liver turns into fat and the patient dies, that is, with animals; these things have not been worked out finally.

"Q. Doctor, you have stated this man is able to work. I am going to ask you under what conditions he is able to work, to do manual labor? A. He should be entirely away from any of these chemicals that bring that about, and the probabilities are

he ought to be kept out of sun light. He may lose sensitization to the sun light, but he will have difficulty in getting this pustule condition relieved permanently. The sun light may bring that about and it is a difficult thing to cure. It is almost next to impossible for him to work in sun light.

"Q. It would be almost impossible for him to perform manual labor in the sun light? A. At this time, I think so."

Dr. Ferguson, upon being questioned as to whether or not the plaintiff was suffering from Barber's itch or acne, made the following answers to the questions propounded to him.

"A. I don't think it is barber's itch, because a sycosis involves the hair, and anything involving the hair is a sycosis. If it invades the oil glands we call it acne. That is the difference. If it gets in the hair we call it sycosis. This man may have both conditions; it may be in the hair folliciles and in the glands too.

"Q. Well, does he have barber's itch? A. No, I don't think that would be a barber's itch. That is a general term and is confined to the beard, but this man has it in the skin above the line of hair; it is on his face up on the cheek bone.

"Q. I will ask you if this man is suffering from acne? A. This is an acneform or rash, and these chemicals are not supposed to produce an acneform, because they dissolve the oil that comes out of the face; and it is logical to suppose that they dissolve the oil and are more likely to be in the oil glands. The dermagolists call that an acne.

"Q. They have what is known as a true acne, do they not, Doctor? A. We have a lot of acnes; acne is a general term. But the acne that the laymen accept is common in adolescence, in youngsters from possibly thirteen to twenty-two. Older people may have acne, but they are generally predicated on the same condition.

"Q. Is this man suffering from such? A. No; I think this is produced by a chemical burn, according to my opinion."

It requires the citation of no authorities, on the statement we have made, to support the ruling of the court, overruling the appellant's motion for an instructed verdict.

■ The jury, answering special issue No. 10, found that appellee had suffered a total incapacity, running from the 3rd day of August, 1941, to the 3rd day of August, 1944. Appellant's second point is that this finding is without support in the evidence

"and is purely speculative and capricious." This point is overruled. On his testimony, appellee received the injury complained of on the third day of August, 1941; trial was had upon the 25th day of February, 1942; his physical condition and his ability to work were explained by his testimony and the testimony of Dr. Ferguson, as given above. Appellee testified that the condition of his skin varied from time to time, depending upon whether it was necessary for him to become over heated or to stay any length of time in the sunlight; he testified that he could not stand any heat whatever and that any kind of work heated his body and caused his vision to get worse, and as a result he could not do anything; he stated that the sun had the same effect upon his face. Appellee's testimony, and the testimony of Dr. Ferguson as given above, support the jury's verdict in answer to special issue No. 10.

■ By points 3, 4, 5, 6 and 7, appellant assigns error against the action of the court in overruling its special exceptions to appellee's petition: (1) That appellee's allegations of the nature of his injuries were vague, general and indefinite and did not inform appellant of the nature of the injuries resulting in the incapacity sued for. (2) That the allegations of the petition were not sufficient to show in what manner appellee's "lessened sight" disabled appellee from performing the usual tasks of a workman. (3) It was not alleged in what manner appellee's "decreased or lessened hearing" disabled him from performing "any type of manual labor or from performing the usual tasks of a workman." (4) That, in connection with the allegations that he "experienced burning and tingling and itching sensations about the face, eyes, ears and nose and experienced difficulty in breathing," appellee did not allege facts showing or tending to show a resulting incapacity. (5) That the allegation that appellee had suffered a "photo-sensitive skin" was insufficient because appellee did not allege facts showing or tending to show a resulting incapacity. The court properly overruled these special exceptions. Appellee plead the resulting injuries, set out in appellant's exceptions, and that these injuries resulted in the incapacity sued for. Appellant's exceptions called for the pleading of the evidence.

■ We give appellant's 11th point: "The court committed error in giving to the jury an oral charge, in that after the find-

ings of the jury had been returned into court and heard and considered by the court, the court spoke to the jury orally, saying: 'Gentlemen of the jury, and you, Mr. Foreman, there is a conflict in your answers to Special Issue No. 8 and Special Issue No. 13. That conflict was caused by myself in giving you a wrong answer on your inquiry to me in writing with reference to the last part or phrase of Issue No. 13. I don't know whether you have that or not, but you understand I give you the wrong answer to that, and by reason of that wrong information there is a conflict. Now I will have to ask you to retire and consider of those two issues, No. 8 and No. 13, after the explanation of my misinformation to you,' the defendant having then and there in open court excepted to the court's instruction and charge to the jury on the ground that it was an improper communication with the jury and an oral charge to the jury." In open court, appellant duly excepted to the charge of the court complained of, on the ground, among others, that it was an "improper communication with the jury and an oral charge to the jury." This point must be sustained. Rule 295, Texas Rules of Civil Procedure, provides: "If the verdict is informal or defective, the court may direct it to be reformed at the bar. If it is not responsive to the issue submitted, or contains conflicting findings, the court shall call the jury's attention thereto in writing and send them back for further deliberation." The oral charge to the jury was in violation of the provisions of Rule 295. In giving additional charges to the jury, this rule must be complied with, since it has the force and effect of a statute. Reed v. Bates, Tex.Civ.App., 32 S.W.2d 216. Where the statute regulating the giving of charges to the jury is violated, error must be presumed. Texas, etc., Co. v. Byrd, 102 Tex. 263, 115 S.W. 1163, 20 L.R.A., N.S., 429, 20 Ann.Cas. 137; Parker v. Bailey, Tex.Com.App., 15 S.W.2d 1033.

We give appellee's construction of Rule 295: "Appellee does not believe the rule cited to-wit, Rule 295, by appellant is mandatory but that same is directory, and while it is possible that the better practice would be that the court should submit all instructions in writing, no harm or injury can be complained of by the appellant here, as he was present during the entire proceedings and, as is reflected by the qualifications attached to the bill of exceptions, the court advised the attorneys that the jury should know that they had been misinformed as to the answer to their inquiry, and then in the presence of counsel and in the presence of the jury, made the statement complained of. A reading of the statement would reveal that at no time did the court instruct the jury as to how they would answer the issues or as to which way, if any, he desired that they should, but that a conflict had been made, not by reason of any fault of the jury, but because of incorrect information given unto the jury by the court, after first advising with counsel." The authorities above cited deny appellee's proposition, that Rule 295 is directory. This Rule has its source in Article 2207, Vernon's Ann.Civ.St., but there was added to this article the affirmative direction that the court must call the jury's attention in writing to the conflicts in its verdict.

Appellant's assignments against the court's charge submitting appellee's average weekly wage can be obviated on another trial.

The judgment of the lower court is reversed and the cause remanded for a new trial.

Reversed and remanded.